ELECTRONICALLY FILED
Craighead County Circuit Court in Jonesboro
Candace Edwards, Craighead Circuit Clerk
2018-Feb-01 16:35:08
16JCV-18-120
C02D02 : 10 Pages

## IN THE CIRCUIT COURT OF CRAIGHEAD COUNTY, ARKANSAS
### WESTERN DISTRICT
### CIVIL DIVISION

**JAY CALVIN PARNELL**                                      **PLAINTIFF**
**and TYLER WREN PARNELL**

**V**                                    **CIV - 2018 - _____**

   **SETERUS, INC.**                                      **DEFENDANT**

### COMPLAINT

   Comes the plaintiffs, Jay Calvin Parnell and Tyler Wren Parnell, his wife, by and through their attorney, Jeannette A. Robertson and for their Complaint states as follows:

   1.   That the plaintiffs, Jay Calvin Parnell and Tyler Wren Parnell, his wife, {hereinafter referred to as "Parnell", reside at 1013 W. Lawson Road, Jonesboro,, Craighead County, Arkansas.  That this property is their homestead.

   2.   That Seterus, Inc., {hereinafter referred to as "Seterus",  is a foreign corporation doing business in Arkansas and listed as in good standing with the state.

   3.   That this cause of action arose in this county and in this state and jurisdiction and venue is proper.

### FACTS

   4.   That on or about September 14, 2006 the plaintiffs, Parnell entered into a promissory note in the original amount of $311,500.00 with Simmons First Bank, which is a Bank organized under the Arkansas laws and doing business in Jonesboro, Craighead County, Arkansas.  The plaintiffs, Parnell, also executed a mortgage document on or about September 14, 2006 on the real property known as 1013 W. Lawson Road, Jonesboro, Craighead county, Arkansas, with said mortgage was filed of record at Mortgage Book 1237, page 430 in the Circuit Clerks office of Craighead County, Arkansas.  A copy of the original promissory note and mortgage is attached hereto as "Exhibit A" and incorporated herein as if set forth word for word.

   5.   The real property known as 1013 W. Lawson Road, Jonesboro, Craighead County,

**EXHIBIT**
**B-1**

Arkansas has a legal description of:

Lot 31A of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat recorded in Plat Cabinet "C" page 123, subject to Bill of Assurance recorded in Mortgage Record 364 page 522, and Amendments recorded in Deed Record 370 page 194, Deed Record 374 page 386 and in Deed Record 553 page 476 at Jonesboro, Arkansas, and to easements as shown on recorded plant, together with an ingress/egress easement along the West 35 feet of Lot 31B of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat recorded in Plat Cabinet "C" page 123.

6.    That on or about February 27, 2013 Simmons First Bank executed an Assignment of Mortgage on the subject property to CitiMortgage, Inc. that was filed for record in the Circuit Clerk's office of Craighead County, Arkansas at JB2013R-004127 on March 7, 2013. A copy of the original Assignment of Mortgage is attached hereto as "Exhibit B".

7.    That on or about February 24, 2014 CitiMortgage, Inc. executed an Assignment of Mortgage to Seterus that was filed for record at the circuit Clerk's office of Craighead County Arkansas at JF2014R-003147 on March 4, 2014. A copy of the original Assignment of Mortgage is attached hereto as "Exhibit C".

8.    That immediately upon assignment of the mortgage held against the Parnell real property homestead from CitiMortgage, Inc. to Seterus, Inc. a payment was refused by Seterus and plaintiffs, Parnell were notified their loan was being placed into a foreclosure status. These events took place even prior to the execution of the Assignment of Mortgage from CitiMortgage, Inc. to Seterus, Inc.

9.    That the plaintiffs, Parnell, were notified less than a week after the February 2014 Assignment of Mortgage documents was filed, that the Mickel law Firm, P.A., out of Little Rock, Arkansas had been referred their debt from Seterus, Inc. for foreclosure but Parnell should contact Seterus, Inc. to discuss alternatives to the foreclosure action.

10.   That on or about March 8, 2014, again less than a week since the February 2014 assignment of mortgage, Seterus, Inc. notified Parnell that to reinstate their loan to a current status an amount of $17,844.34 would need to be paid within 3 weeks or the foreclosure action would proceed. This same notice also stated Parnell was to continue making payments on the mortgage when due.

11.   That on or about April 14, 2014, Seterus notified Parnell they were refusing to

accept the March 1, 2014 mortgage payment due to a foreclosure being in progress.

12. Parnell continued to send mortgage payments to Seterus through out 2014 with some being accepted and some being refused. Parnell requested a loan modification resolution from Seterus and paperwork was exchanged between the parties even while a non-judicial foreclosure had been started in June, 2014.

13. Parnell and Seterus reached a verbal agreement as to a loan modification to reinstate the loan to a current status, lower the monthly payments and interest rate in late 2014. Seterus sent a Loan Modification package of documents in the middle of December 2014 to Parnell for signing. Parnell signed the Loan Modification documents but since both the payment amount and interest rate was higher than was agreed to verbally between the parties, Parnell wrote notes on the Loan Modification documents reflecting this discrepancy, although Parnell did sign the documents and overnight them back to Seterus on or about December 18, 2014.

14. Parnell began making the higher monthly mortgage payments under the Loan Modification paperwork to Seterus beginning in January 2015 and continued throughout 2015 but again Seterus began accepting and then refusing payments and placed Parnell back into a non-judicial foreclosure action in May 2015.

15. Parnell communicated on multiple occasions with agents for Seterus trying to obtain documentation on why Seterus was accepting some payments and refusing others and also why Seterus was reflecting a large arrearage in payments when a loan modification had been signed in December 2014. Parnell never received an explanation for the discrepancy between his payment records and that of Seterus.

16. Parnell and Seterus agreed to re-execute the December 2014 Loan Modification documents in September 2015. Parnell executed those documents on or about September 10, 2015 and overnighted them again to Seterus.

17. Parnell spoke with an Adam Crawford, an agent for Seterus, on September 22, 2015 who confirmed the non-judicial foreclosure had been stopped and confirmed with him and a second agent of Seterus, a Lamont Lee, that Parnell would be

considered current on all payments as of the September Loan Modification and should just send in the October 2015 payment for the normal amount.

18. Seterus notified Parnell, on or about January 6, 2016 that his loan was in default in the amount of $20,834.01. Parnell was provided no explanation as to why this claimed default existed nor was he provided documentation supporting the claim.

19. Seterus sent an account statement dated January 18, 2016 that reflected $4961.60 in attorney fees and costs from November 2015. This same account statement listed alleged outstanding mortgage payments from August 2015 through January 2016. Parnell had been told his payments were considered current through September 2015 due to the Loan Modification documents being signed and his records reflect he made his payments as required from the date of the Loan Modification. Parnell contacted Seterus upon receiving the January account statement to request further explanation of his account status without satisfaction.

20. Seterus sent a letter dated January 19, 2016, one day after the January 18, 2016 account statement date, reflecting they had accepted a payment in the amount of $4280.80, however, this payment was not reflected on the January 18, 2016 account statement.

21. Seterus sent a second account statement to Parnell dated January 20, 2016 that reflected his $4280.80 payment but again this statement reflected claimed non-payments for August 2015 through January 2016, that Parnell knew to be inaccurate.

22. Parnell continued to communicate with Seterus agents verbally during 2016 trying to resolve the discrepancy between Seterus' records and his own payments, along with the affect the Loan Modification had on his payment status, while also making his regular payments and several large additional payments.

23. Parnell continued to receive written account statements and then supplemental letters every month during 2016 that reflected different amounts of balances due. Parnell continued to work with Seterus to resolve the large discrepancies between his records of payments and those of Seterus through out 2016 with little success.

24. Parnell and Seterus continued through 2017 communicating verbally with Parnell

attempting to get explanations as to why there were still discrepancies between his payment records and that of Seterus without success. Seterus accepted most payments from Parnell during 2017 but again began refusing payments in 2017, without explanation.

25. Parnell was notified by a law firm out of Little Rock in August, 2017 that his account with Seterus was being turned over for foreclosure action and he should work with his mortgage holder to resolve the situation.

26. Parnell received a letter dated October 10, 2017 that represented itself as a reinstatement letter explanation where it appears Seterus took mortgage payments from Parnell during 2016 and 2017 and paid attorney fees and costs from 2015 and 2016 and then reflected it had not received those mortgage payments for the stated months and years. Further, this reinstatement notice reflects non-payment of taxes and insurance that are part of the mortgage payments, when it appears from Parnell records mortgage payments were properly made to Seterus but Seterus applied those funds to attorney fees and costs from 2015 and 2016. This same letter also reflected Seterus was charging Parnell with "Property Inspection costs" beginning in March 2015 through the entire years of 2015, multiple charges for 2016 and monthly charges for January 2017 through September 2017. In this accounting for "Property Inspection Costs" there appear to be credits against those costs that Parnell believes were taken from mortgage payments he submitted in 2016 and 2017. Parnell submits they have lived continuously in the real property that is the subject of this lawsuit and at no time did an agent for Seterus "inspect" the home.

27. Seterus authorized Wilson & Associates, a law firm out of Little Rock, Arkansas to begin a non-judicial foreclosure that was filed on December 4, 2017 with the Circuit Court of Craighead County, Arkansas as 2017R-022289. This non-judicial foreclosure notice was mailed to Parnell and noted a sale date of February 5, 2018 at 2:30 p.m. at the Craighead County Courthouse. A copy of this Notice of Default and Intention to Sell is attached as "Exhibit D" to this complaint and incorporated herein as if set forth word for word.

28. Parnell has continued to send mortgage payments to Seterus from the later months of 2017 through January 2018 with those payments being refused.

29. Parnell has equity in his homestead, the real property that is the subject of his complaint and the pending non-judicial foreclosure action.

## CAUSE OF ACTION I - EX PARTE RESTRAINING ORDER

30. The factual allegations set forth in paragraphs 1 through 29 are herein re-alleged.

31. Parnell submits that if the non-judicial foreclosure action were to be allowed to continue through the sale of the real property that is their homestead at 1013 W. Lawson Road, Jonesboro, Craighead County, Arkansas, they would be irreparably harmed as it would render them homeless and they would lose the significant equity that is currently in said real property.

32. Parnell submits that from the beginning of the servicing of the promissory note and mortgage through Seterus, Inc. in February 2014, there has been significant inaccuracies in the accounting of mortgage payments by Seterus, even after multiple efforts by Parnell to rectify their records with Seterus, thereby placing Parnell in jeopardy of losing their home through the non-judicial foreclosure process.

33. Parnell has made significant efforts to repeatedly to obtain accurate records from Seterus when accounting statements provided to Parnell reflected incorrect payment histories without success.

34. Parnell in good faith entered into negotiations with Seterus to modify the outstanding loan but when the Loan Modification documents were first provided in December 2014 they did not correctly reflect the new terms previously agreed to by Parnell such that hand written corrections were made to said documents.

35. Parnell made payments under the Loan Modification documents of December 2014 but Seterus inaccurately reflected Parnell was over $20,000.00 in arrears, thereby beginning the vicious cycle again of claims of default and delinquency.

36. Parnell submits that pursuant to Arkansas Rules of Civil Procedure, Rule 65 as amended, authorizes the Court to issue an *ex parte* restraining order or injunction based on a verified complaint of requesting party reflecting specific facts showing

the harm that will result if the order is not issued immediately and without notice to the adverse party. Parnell submits that his homestead is currently scheduled to be sold on February 5, 2018, less than 4 days from the filing of this complaint and there is insufficient time to serve this complaint and obtain an answer prior to the sale, such that Parnell will be irreparably harmed if the *ex parte* order of restraint or injunction is not issued immediately.

37.   Parnell submits that prior to the filing of this verified complaint he retained counsel to contact Seterus through its legal representative handling the non-judicial foreclosure, Wilson & Associates, P.L.L.C.  Counsel for Parnell immediately began attempting to obtain a delay in the real property sale to allow the parties to resolve the payment records in this matter but the defendant, Seterus, Inc. refused to agree to any delay.

38.   Parnell submits if the February 5, 2018 sale is allowed to take place they will lose their homestead and the equity they have accrued in said residence over more than 12 years and as such would be irreparably harmed.  Further, Parnell submits that they believe they will prevail on the merits of this complaint by proving Seterus failed to act in good faith in its dealings with Parnell and that Seterus breached its Loan Modification contract by placing the wrong terms in the original documents, failing to keep accurate records, failing to accept payments when tendered, and improperly crediting mortgage payments to attorney fees and costs.

39.   Parnell prays for the Court to issue an *ex parte* restraining order or injunction against Seterus, Inc. and its agent Wilson & Associates, P.L.L.C. to halt the non-judicial foreclosure sale of the real property known as 1013 W. Lawson Road, Jonesboro, Arkansas 72404 and as described in its legal description hereinabove.

## CAUSE OF ACTION II - INJUNCTION

40.   Parnell re-alleges and restates the facts and allegations set forth in paragraph 1 through 39 above.

41.   Parnell submits that after service of this complaint and notice of the *ex parte* restraining order/ injunction requested above that the Court extend said restraining order/injunction against the defendant Seterus, Inc. and its agent Wilson &

Associates P.L.L.C. for an indefinite period to allow the plaintiff to obtain records from Seterus and CitiMortgage in support of its breach of contract cause of action and failure to act in good faith action against the defendant.

42.    Parnell submits that the *ex parte* order is set by our State's procedural rules to expire within 14 days of its issuance and even with nearly immediately service upon the defendant of this complaint the defendant's time to answer or file an appropriate pleading will not have expired such that it is in both parties interest that the *ex parte* order of restraint/injunction be extended for an indefinite period. Such an extension would not harm either party and would allow an orderly progression of the litigation through discovery and hearing.

43.    Parnell submits there are years of records that must be obtained from their personal bank along with records held by CitiMortgage Inc. and Seterus, Inc. that are vital to the case of the plaintiff for use at trial.

44.    Parnell submits their homestead is being placed at risk by the actions of the defendant and they will be irreparably harmed should the restraining/injunction order be allowed to expire or end prior to Parnell being given an opportunity to obtain the records they need to prove their causes of action against the defendant.

45.    Parnell prays for the Court to grant an extension of the *ex parte* restraining/injunction order upon its expiration under Arkansas procedural rules by issuing a modified order enjoining Seterus, Inc. and its agent, Wilson & Associates P.L.L.C. for an indefinite period of time from proceeding with its non-judicial foreclosure until this case is heard on its merits.

## CAUSE OF ACTION III - BREACH OF CONTRACT AND BAD FAITH

46.    Parnell re-alleges and restates the facts and allegations set forth in paragraph 1 through 45 above.

47.    Parnell states that the records will reflect that Seterus, Inc. was in breach of the assigned promissory note and mortgage when on February 13, 2014 it claimed the debt was in an accelerated status and demanded Parnell pay the full balance of the loan even prior to the loan being properly assigned by CitiMortgage, Inc.

48.    Parnell states that the defendant failed to check the accuracy of the records

transferred from CitiMortgage, Inc., the previous service provider, prior to reflecting an acceleration of the full debt and beginning to refuse mortgage payments in February, 2014, the same month it was assigned the note and mortgage.

49.    Parnell states they, in good faith, continued to tender mortgage payments to the defendant, with some being refused and others being accepted, while also communicating verbally with agents of the defendant in an attempt to resolve the discrepancies in the payments records.

50.    Parnell states the defendant failed in its duties to review the accuracy of the records it received from CitiMortgage and those kept by its own agents as to the accuracy of payments tendered.  Further, Parnell states the defendant refused payments against the debt in bad faith causing Parnell to accrue late charges and ultimately attorney fees and costs for defendant placing the debt into a non-judicial foreclosure.

51.    Parnell states the defendant had a contractual duty to investigate the basis of its claim the debt was to be placed in an accelerated status and that it had received accurate records from the previous service provider and it failed in that duty causing Parnell to incur additional charges, attorney fees and costs that were accessed against its outstanding debt and secured by Parnell's homestead.

52.    Parnell states that as a direct result of the actions noted herinabove by the defendant and its agents Parnell was damaged in the form of attorney fees and costs assessed against the debt, improperly accessed "Property Inspection Fees", when no such inspections took place and in breach of the contract duty of the defendant, and improperly assessed late charges when payments were tendered timely.  Parnell states that their damages are in excess of $15,000.00.

53.    Parnell states that they reserve the right to Amended this Complaint to state additional causes of action.

WHEREFORE, plaintiffs, Jay Calvin Parnell and Tyler Wren Parnell pray that the Court find and order *ex parte* a restraining/injunction order against the defendant, Seterus, Inc. and its legal agent, Wilson & Associates P.L.L.C. enjoining them from conducting the non-judicial sale

of plaintiffs' homestead, the real property known as 1013 W. Lawson Road, Jonesboro,
Craighead County, Arkansas set for February 5, 2018 at 2:30 p.m. for the reasons set froth
herein; that the Court find and order that the *ex parte* restraining/injunction order be extended
indefinitely by a modification of the original *ex parte* order for the reasons set forth herein and to
allow the defendant an opportunity to properly respond and the plaintiffs an opportunity to obtain
discovery held in the hands of third parties to support it causes of action; that the Court find that
the defendant has acted in bad faith and breached the contract and that as a direct result of those
actions the plaintiffs have been damaged in excess of $15,000.00; that the plaintiffs reserve their
right to amend this complaint; and for all other relief to which they are entitled.

Respectfully submitted by:

_____
Jay Calvin Parnell - Plaintiff

_____
Tyler Wren Parnell - Plaintiff

_____
Jeannette A. Robertson - Attorney for
Plaintiff

**VERIFICATION OF PLEADING**

STATE OF ARKANSAS
COUNTY OF CRAIGHEAD

   I, Jay Calvin Parnell and Tyler Wren Parnell, state upon oath and by our signatures below that we have read the above
complaint and statements therein and that those statements are true and accurate to the best of our knowledge.

_____
Jay Calvin Parnell - Plaintiff

_____
Tyler Wren Parnell - Plaintiff

   SUBSCRIBED and SWORN to before me this 1st day of February, 2018.

_____
Notary Public

My Commission Expires:

| Jeannette Robertson |
| Notary Public (seal) |
| Craighead County, Arkansas |
| Comm. Number 12390072 |
| Comm. Expires 8-27-2022 |

ELECTRONICALLY FILED
Craighead County Circuit Court in Jonesboro
ndace Edwards, Craighead Circuit Clerk
2018-Feb-01 16:58:39
16JCV-18-120
C02D02 : 20 Pages

**ORIGINAL**

MIN: 1003460-0000006203-5
MERS PHONE: 1-888-679-6377

# NOTE

September 14, 2006      Jonesboro      Arkansas
[Date]           [City]           [State]

1013 W Lawson Rd  ,Jonesboro,AR 72404-9041

[Property.Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 311,500.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Simmons First Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.0000   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   1st   day of each month beginning on   November 1, 2006   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   October 1, 2021   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P.O. Box 1720, Jonesboro, AR 72403-1720

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $2,628.61

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Form 3200 1/01
Wolters Kluwer Financial Services
VMP®-5N (0207).01    LW 07/03/03
Page 1 of 3      Initials: _____

*Exhibit A"*

 

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.0000     % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



 

## 10. UNIFORM SECURED NOTE

'This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Jay Calvin Parnell, Jr.     -Borrower

_____ (Seal)
Tyler Wren Parnell     -Borrower

_____ (Seal)
     -Borrower

_____ (Seal)
     -Borrower

_____ (Seal)
     -Borrower

_____ (Seal)
     -Borrower

_____ (Seal)
     -Borrower

_____ (Seal)
     -Borrower

*[Sign Original Only]*

Pay to The Order Of
Simmons First National Bank
Without Recourse
Simmons First Bank
By: Karen Gott
Karen Gott, Mortgage Loan Officer

Pay To The Order Of
CITIMORTGAGE, INC.
Without Recourse
Simmons First National Bank
By: Nancy L. Schumacher
Nancy L. Schumacher
Assistant Vice President

Pay to the order of
without recourse on us CitiMortgage, Inc.
Janet L. Sims, Vice President
CitiMortgage, Inc.

MTG BK 1237 PG 430

0020027755 29

Return To:

**Lenders Title Company**
2207 Fowler Avenue
Jonesboro, Arkansas 72401
06-047740-300

ORIGINAL

Prepared By:
Denise Klingensmith

[Space Above This Line For Recording Data]

# MORTGAGE

MIN 1003460-0000006203-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    September 14, 2006    ,
together with all Riders to this document.
**(B) "Borrower"** is Jay Calvin Parnell, Jr. and Tyler Wren Parnell, Husband and Wife

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is Simmons First Bank

Lender is a a Corporation
organized and existing under the laws of   The State of Arkansas
Lender's address is  P.O. Box 1720, Jonesboro, AR 72403-1720

6001879PARNELL                6001879
ARKANSAS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS              Form 3004  1/01

-GA(AR) (0306)
Page 1 of 18    MW 03/03      MW0300   VP  T P
VMP Mortgage Solutions (800)521-7291

MTG BK 1237 PG 431

(E) "Note" means the promissory note signed by Borrower and dated   September 14, 2006
The Note states that Borrower owes Lender   Three Hundred Eleven Thousand Five Hundred
and no/100                                                                                Dollars
(U.S. $311,500.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   October 1, 2021                           .
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

6001879PARNELL                    6001879

MTG BK 1237 PG 432

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County                          of                          CRAIGHEAD                          :
          [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

See attached Exhibit "A"

Parcel ID Number: 01-133121-05600                          which currently has the address of
1013 W Lawson Rd                          [Street]
Jonesboro                          [City], Arkansas 72404-9041 [Zip Code]
("Property Address"):

          TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

          BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

          THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

          UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

          1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

6001879PARNELL                          6001879                          0

-3A(AR) (0308)                          Page 3 of 15                          Initials: [handwritten]                          Form 3003  1/01

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

6001879PARNELL                           6001879                                                    0

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

6001879PARNELL                                      6001879                                                         0

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

6001879PARNELL                         . 6001879                                                    0

MTG BK 1237 PG 437

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

6001879PARNELL                          6001879                                    0

-6A(AR) (0308)                    Page 8 of 15              Initials: JP / TP        Form 3001 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

6001879PARNELL                     6001879                                    0

-6A(AR) (0305)              Page 9 of 15         Initials: JP    Form 3004  1/01
                                                          TP

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

6001879PARNELL                         6001879                                   0

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

6001879PARNELL                                6001879                                                    0

MTG BK 1237 PG 441

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

6001879PARNELL

(...)-6A(AR) (0003)

6001879

Page 12 of 15

Initials: LP
TP

0

Form 3004   1/01

MTG BK 1237 PG 442

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

It is understood and agreed to by Borrower that this Security Instrument is subject to the foreclosure procedures of the Arkansas Statutory Foreclosure Law, Act 53 of 1987, as amended from time to time (the "Act"), for Borrower's breach of any covenant or agreement in this Security Instrument. In furtherance and not in limitation of the provisions of Section 12, any forbearance by Lender in exercising any right or remedy under the Act shall not be a waiver of or preclude acceleration and the exercise of any right or remedy under the Act, or at the option of Lender, use of judicial foreclosure proceedings.

**23. Release.** Upon payment in full of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

6001879PARNELL                    6001879                                        0

Initials: [handwritten]

-6A(AR) (0305)                    Page 13 of 15                    Form 3003    1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        Jay Calvin Parnell JR (Seal)
                                        Jay Calvin Parnell, Jr.              -Borrower

_____        Tyler Wren Parnell (Seal)
                                        Tyler Wren Parnell                   -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                               -Borrower

6001879PARNELL                6001879                              0

MTG BK 1237 PG 444

**STATE OF ARKANSAS,**                     Craighead      **County ss:**

On this the  14th   day of    September, 2006    , before me, the undersigned officer,
personally appeared  Jay Calvin Parnell. Jr. and Tyler Wren Parnell, Husband and
Wife

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged that he/she (they) executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

My Commission Expires:

```
TAMMY M. LIDDELL
NOTARY PUBLIC - ARKANSAS
CRAIGHEAD COUNTY
My Commission Expires 11/05/2006
```

Notary Public    Tammy M Liddell

Lien Holder:

Address:

Telephone Number:

Contact

                    for release of lien.

6001879PARNELL              6001879                    0

VMP -6A(AR) (0308)          Page 15 of 15      Initials: JP      Form 3004  1/01
                                               TP

Escrow File No.: 06-047740-300

MTG BK 1237 PG 445

## EXHIBIT "A"

Lot 31A of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat recorded in Plat Cabinet "C" page 123, subject to Bill of Assurance recorded in Mortgage Record 364 page 522, and Amendments recorded in Deed Record 370 page 194, Deed Record 374 page 386 and in Deed Record 553 page 476 at Jonesboro, Arkansas, and to easements as shown on recorded plat, together with an ingress/egress easement along the West 35 feet of Lot 31B of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat recorded in Plat Cabinet "C" page 123.

MTG BK 1237 PG 430 - 445
DATE 09/20/2006
TIME 03:35:20 PM
RECORDED IN
OFFICIAL RECORDS OF
CRAIGHEAD COUNTY
ANN HUDSON
CIRCUIT CLERK

ELECTRONICALLY FILED
Craighead County Circuit Court in Jonesboro
Circuit Clerk
58:39
JB2013R-0041JCV-18-120
ANN HUDSON
CRAIGHEAD COUNTY
2D02 : 3 Pages
RECORDED ON:
03/07/2013    11:31AM
BY

When Recorded Return To:
CT LIEN SOLUTIONS
PO BOX 29071
GLENDALE, CA 91209-9071
Phone #: 800-331-3282

Prepared By:
CITIMORTGAGE, INC
FREDERICK SILVA
1000 TECHNOLOGY DRIVE, MS 321
O'FALLON, MO 63368-2240

## ASSIGNMENT OF MORTGAGE

MERS SIS # 888-679-6377 MIN: 100346000000062035

NOW ALL MEN BY THESE PRESENTS:
FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, the undersigned, Mortgage Electronic Registration Systems, Inc. as nominee for Simmons First Bank,  ("Assignor"), hereby grants, sells, conveys, transfers and assigns to  CitiMortgage, Inc. ("Assignee") all of its right, title and interest in and to a certain Mortgage executed by Jay Calvin Parnell, Jr. and Tyler Wren Parnell to Mortgage Electronic Registration Systems, Inc. as nominee for Simmons First Bank in Book: 1237 Page: 430  Register's Office for Craighead County (Western District), Arkansas (the "Mortgage").

Description/Additional Information: See Exhibit A

DATE: _2·27·13_

Page # 1 37126094 24449 AR553 Craighead County { Internal

*Exhibit B"*

Mortgage Electronic Registration Systems, Inc. as nominee for Simmons First Bank

By: Sandra West
Assistant Secretary


STATE OF MISSOURI, ST. CHARLES COUNTY

On 02-27-2013 _____ before me, the undersigned, a notary public in and for said state, personally appeared Sandra West, Assistant Secretary of Mortgage Electronic Registration Systems, Inc. as nominee for Simmons First Bank personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

> SYBIL SHORT
> Notary Public - Notary Seal
> State of Missouri
> Commissioned for St. Louis County
> My Commission Expires: March 19, 2016
> Commission Number: 12318670

Notary Public Sybil Short

Commission Expires: 03/19/2016


Page # 2 37126094 24449 AR553 Craighead County ( Internal

Exhibit A

Lot 31A of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat
recorded in Plat Cabinet "C" page 123, subject to Bill of Assurance recorded in Mortgage
Record 364 page 522,  and Amendments recorded in Deed Record 370 page 194, Deed
Record 374 page 386 and in Deed Record 553 page 476 at Jonesboro, Arkansas, and to
easements as shown on recorded plat, together with an ingress/egress easement along the
West 35 feet of Lot 31B of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as
shown by plat recorded in Plat Cabinet "C" page 123.



When Recorded Return To:
CitiMortgage, Inc.
C/O Nationwide Title Clearing.
Inc. 2100 Alt. 19 North
Palm Harbor, FL 34683

**Citi Loan No 2003775529**
**Seterus Loan No:25606684**
**Fannie Loan No 1702134810**

CRAIGHEAD COUNTY
RECORDED ON:
03/04/2014    02:35PM

_signature_ ,D. C.

## ASSIGNMENT OF MORTGAGE

**Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #1-866-570-5277, which is responsible for receiving payments.**

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **CITIMORTGAGE, INC.,WHOSE ADDRESS IS 1000 TECHNOLOGY DRIVE, O'FALLON, MO, 63368, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **FEDERAL NATIONAL MORTGAGE ASSOCIATION, WHOSE ADDRESS IS 14221 DALLAS PARKWAY, SUITE 100, DALLAS, TX 75254, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage is dated 09/14/2006 and recorded in Book 1237, Page 430, as Document # in the register's office for CRAIGHEAD WEST County, Arkansas, made by **JAY CALVIN PARNELL JR AND TYLER WREN PARNELL** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR SIMMONS FIRST BANK.**

Dated on _02 24_ /2014 (MM/DD/YYYY).
**CITIMORTGAGE, INC.**

By: _____
~~Robert Vercellini~~
**VICE PRESIDENT**

All Authorized Signatories whose signatures appear above have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA    COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on _2 24_ /2014 (MM/DD/YYYY), by Robert Vercellini as VICE PRESIDENT of CITIMORTGAGE, INC., who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_signature_

FRANCE M. MOSS
Notary Public - State of FLORIDA
Commission expires: 08/05/2016

France M. Moss
Notary Public State of Florida
My Commission # EE 222298
Expires August 5, 2016

**Document Prepared By:** E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
CMOAV 22376779 -- MSR-2014-02-01    DOCR T2114021811  [C-1]  FRMAR1

*D0005440670*

"Exhibit C"

ELECTRONICALLY FILED
Craighead County Circuit Court in Jonesboro
Candace Edwards, Craighead Circuit Clerk
2018-Feb-01 16:58:32
16JCV-18-120
C02D05

**2017R-022289**
CERTIFICATE OF RECORD
JONESBORO DISTRICT
CRAIGHEAD COUNTY, ARKANSAS
CANDACE EDWARDS, CLERK & RECORDER
12/04/2017  8:00:22 AM
NON JUDICIAL NOTICE FEE: 140.00
RECORDING FEE: 35.00
PAGES: 2

This Instrument Prepared by:
WILSON & ASSOCIATES, P.L.L.C.
400 West Capitol Avenue
Suite 1400
Little Rock, AR 72201
(501) 219-9388

## NOTICE OF DEFAULT AND INTENTION TO SELL

### YOU MAY LOSE YOUR PROPERTY IF YOU DO NOT TAKE IMMEDIATE ACTION.

### IF YOUR PROPERTY IS SOLD, YOU WILL REMAIN LIABLE FOR ANY DEFICIENCY WHICH THEN EXISTS AND AN ACTION FOR COLLECTION MAY BE BROUGHT AGAINST YOU.

### THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR SUCH PURPOSE.

WHEREAS, on September 14, 2006, Jay Calvin Parnell, Jr. and Tyler Wren Parnell executed a security instrument conveying certain property therein described to Mortgage Electronic Registration Systems, Inc., as nominee for Simmons First Bank, its successors and assigns; and

WHEREAS, said instrument was duly recorded September 20, 2006, in Book No. 1237, at Page 430, and modified on November 19, 2015, Document No. JB2015R-018019 in the real estate records of Craighead (Jonesboro) County, Arkansas; and

WHEREAS, default has been made with respect to a provision in the mortgage that authorizes sale in the event of the default of said provision and the same is now, therefore, wholly due.

WHEREAS, mortgagee or beneficiary has complied with the conditions to exercise the power of sale as set for in ACA §18-50-103. The party initiating this action is Federal National Mortgage Association ("Fannie Mae"), 14523 SW Millikan Way Suite 200, Beaverton, OR, (866) 570-5277

NOW, THEREFORE, Wilson & Associates, P.L.L.C., as Attorney-in-Fact or as Trustee,, by virtue of the power, duty, and authority vested in and imposed upon it, will, on February 5, 2018, at or about 2:30 PM at the Craighead (Jonesboro) County Courthouse, Jonesboro, Arkansas, offer for sale certain property hereinafter described to the highest bidder for cash, free from the statutory right of redemption, homestead, dower, and all other exemptions which are expressly waived in the mortgage, said property being real estate situated in Craighead (Jonesboro) County, Arkansas, and being more particularly described as follows:

Lot 31A of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat recorded in Plat Cabinet "C" page 123, subject to Bill of Assurance recorded in Mortgage Record 364 page 522, and Amendments recorded in Deed Record 370 page 194, Deed Record 374 page 386 and in Deed Record 553 page 476 at Jonesboro, Arkansas, and to easements as shown on recorded plat, together with an ingress/egress easement along the West 35 feet to Lot 31B of Replat of Lot 31 of Southview Acres, Jonesboro, Arkansas, as shown by plat recorded in Plat Cabinet "C" page 123.

More commonly known as: 1013 West Lawson Road, Jonesboro, AR 72404

W&A. No. 157937
Seterus, Inc.



694239

"Exhibit D"

This sale is subject to all matters shown on any applicable recorded plat; any unpaid taxes; any restrictive covenants, easements, or setback lines that may be applicable; any statutory rights of redemption of any governmental agency, state or federal; any prior liens or encumbrances as well as any priority created by a fixture filing; and to any matter that an accurate survey of the premises might disclose.

The sale held pursuant to this Notice may be rescinded at any time. The right is reserved to adjourn the day of the sale to another day, time and place certain without further publication, upon announcement at the time and place for the sale set forth above. THE SALE OF THIS PROPERTY WILL BE AUCTIONED WITH RESERVE. THE TERMS OF SALE ARE CERTIFIED FUNDS PAID AT THE CONCLUSION OF THE SALE, OR CREDIT BID FROM A BANK OR OTHER LENDING ENTITY PRE-APPROVED BY THE SUCCESSOR TRUSTEE. **W&A No. 157937**

WILSON & ASSOCIATES, P.L.L.C.
400 West Capitol Avenue
Suite 1400
Little Rock, AR 72201
(501) 219-9388

By: _____
Maria Yoder (2006278)

Date: ____12/01/17____

ACKNOWLEDGMENT

STATE OF ARKANSAS
COUNTY OF PULASKI

Before me, the undersigned notary public of the state and county aforesaid, personally appeared Maria Yoder, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, acknowledged such person to be an Attorney (or other such officer authorized to execute the instrument) of Wilson & Associates, P.L.L.C., and that such officer executed the foregoing instrument for the purposes therein contained by personally signing hereto.

Witness my hand and seal at office in Little Rock, Arkansas this __1st__ day of __December, 2017__.

```
╔═══════════════════╗
║  NOTARY           ║
║  ARKANSAS  MATT ROBINS        ║
║  PUBLIC    No. 12399751       ║
║            PULASKI COUNTY     ║
║         Commission Expires 4-25-2024 ║
╚═══════════════════╝
```

_____
Notary Public

My Commission Expires: __4-25-2024__

W&A. No. 157937
Seterus, Inc.

2